# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

   v.                                                     Case No. 13-CR-197

**DAVID WEAVER**
        **Defendant.**

## DECISION AND ORDER

The government charged defendant David Weaver with child pornography offenses. Defendant moved to suppress statements he made to law enforcement during a "knock and talk" encounter at his home, arguing that he was in custody and the officers failed to provide Miranda warnings. The police used defendant's statements to obtain a search warrant, and defendant also sought suppression, as fruit of the poisonous tree, of the physical evidence seized pursuant to the warrant.

The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, then issued a recommendation that the motion be denied. Defendant objects, so I must review the matter de novo. See Fed. R. Crim. P. 59(b).

## I. FACTS

Neither side objects to the facts set forth in the magistrate judge's recommendation, which are largely undisputed. The police audio recorded the encounter at defendant's home, and the parties stipulated to other pertinent facts. I therefore adopt the magistrate judge's statement of facts and present a focused version of the events herein.

On February 18, 2013, at about 6:35 p.m., Detectives Hermann and Lambrecht of the

Ozaukee County Sheriff's Department went to defendant's residence to investigate information that a suspected child pornography video had been sent from defendant's IP address to an individual in New York. The detectives, dressed in plain clothes, knocked on the door and identified themselves; defendant's wife admitted the detectives. Defendant soon appeared, and the detectives asked if they could talk to the Weavers about an investigation they were working on. The Weavers agreed, and the four proceeded to the kitchen area, sitting at the table. The detectives explained that they were investigating a computer crime in which an illegal video had been shared through an IP address traced to the Weaver residence and questioned the Weavers regarding their internet service provider, computers, and Wi-Fi security.

Detective Hermann then showed the Weavers an image of a boy from the illegal video, and both denied having seen it before. Hermann asked if the image would be on anyone's computer, and defendant said, "Not that I know of." (Govt.'s Ex. 2 at 13.) Hermann explained that they had brought with them a computer analyst, who was waiting in a car outside, and that they wanted consent to search the Weaver's computers. Mrs. Weaver asked if "whoever's doing this, can they save it to our stuff"? (Govt.'s Ex. 2 at 14.) The following exchange then occurred:

DETECTIVE HERMANN   No.

ANN WEAVER   Ok.

DETECTIVE LAMBRECHT   No.

DETECTIVE HERMANN   They're just using your service.

ANN WEAVER   Ok.

DETECTIVE HERMANN   From your wireless.

2

DAVID WEAVER     Their [sic] on my computer up there.

ANN WEAVER     What is?

DAVID WEAVER     These images are.

DETECTIVE HERMANN     Ok.  Want to talk about it a little bit?

DAVID WEAVER     I've been sharing images like that.

ANN WEAVER     You have?

DETECTIVE HERMANN     Is this is [sic] something that we could talk to David alone for a little bit.

ANN WEAVER     Yeah.

DETECTIVE HERMANN     Ok.  Well you want to tell us about it a little bit?

DAVID WEAVER     It's just something I started doing and I, I never had any intent on meeting anyone, I just, it got out of hand.

DETECTIVE HERMANN     Yeah ok, obviously this is a little concern for us.

DAVID WEAVER     Um hmm.

DETECTIVE HERMANN     You probably got some images up there right now.

DAVID WEAVER     Yep.

DETECTIVE HERMANN     Is this something that you still give consent for us to take a look?

DAVID WEAVER     Yeah.

DETECTIVE HERMANN     Or something you could show us.  How many images are we talking about?

DAVID WEAVER     There's a lot.

DETECTIVE HERMANN     How much do you think?

DAVID WEAVER     I don't know.

DETECTIVE HERMANN     Ok.

> DETECTIVE LAMBRECHT    What, what, how did you initially get into this? What . . .
>
> DAVID WEAVER    (Sigh) Something happened in '04, where we had a friend who disowned me and I tried to portray myself as someone else to try to contact the kid.
>
> DETECTIVE HERMANN    Sure.
>
> DAVID WEAVER    And it just got out of hand.
>
> DETECTIVE HERMANN    Ok, kind of living a side life.
>
> DAVID WEAVER    Yeah.
>
> DETECTIVE HERMANN    Ok.
>
> DAVID WEAVER    And that didn't materialize by contact, not meet up with him, but just talk to him because the mother wouldn't let me talk to him anymore.
>
> DETECTIVE HERMANN    Alright, we talking about just videos and images probably? About how old, what kind of age range?
>
> DAVID WEAVER    There's some young ones.
>
> DETECTIVE HERMANN    Ok, alright. Alright. Obviously I'd like to talk to you more about this.
>
> DAVID WEAVER    Ok.
>
> DETECTIVE HERMANN    But I don't want to get too far into it without protecting your rights and protecting our rights and everything like that.

(Govt. Ex. 2 at 14-15.) The detectives had been in the Weaver home for about 27 minutes at that point. Hermann read defendant the Miranda rights, and defendant invoked his right to counsel. Hermann stopped the questioning and advised defendant that they would be freezing the scene until they could obtain a warrant for the computers. Hermann further advised defendant that he was being detained while they obtained the warrant. The detectives summoned a uniformed deputy, who arrested and handcuffed defendant at about 7:41 p.m.,

4

transporting him to the Ozaukee County Jail. Hermann applied for a warrant, relying on defendant's admission that he had images on his computer. (Govt.'s Ex. 9 at 5.) The warrant issued at 9:15 p.m., and the police executed it at about 9:40 p.m. The detectives never drew their firearms at any point during their encounter with the Weavers, and defendant was not handcuffed prior to his arrest and transport to the jail.

## II. DISCUSSION

In order to protect the right against self-incrimination, a person must be advised of certain rights before being subjected to custodial interrogation. See Miranda v. Arizona, 384 U.S. 436 (1966). To implicate Miranda, the person must be both "in custody" and subject to "interrogation." United States v. Yusuff, 96 F.3d 982, 987 (7th Cir. 1996). It is undisputed that the detectives interrogated defendant; the issue is whether he was in custody at the time he made the damaging admissions.

"An individual is considered 'in custody' when his movement is restrained to the degree comparable to a formal arrest." Id. The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Stansbury v. California, 511 U.S. 318, 323 (1994). In other words, the relevant inquiry is how a reasonable man in the suspect's shoes would have understood the situation. Berkemer v. McCarty, 468 U.S. 420, 442 (1984). Pertinent factors include the location of the encounter, whether the person consented to speak to the police, the number of officers involved, whether the officers displayed weapons or used physical force or a threatening tone, and whether the officers informed the individual that he was not under arrest. See, e.g., United States v. Ambrose, 668 F.3d 943, 956 (7th Cir. 2012).

I agree with the magistrate judge that defendant was not in custody at the time he made

5

the admissions. The encounter occurred in defendant's home, and "such a location generally presents a less intimidating atmosphere than, say, a police station." United States v. Hughes, 640 F.3d 428, 436 (1st Cir. 2011); see also United States v. Bush, 820 F.2d 858, 861 (7th Cir. 1987) (finding no custody where the defendant "freely discussed the case with the agent in the privacy and comfort of his own home"). Both defendant and his wife agreed to speak to the police. See United States v. Thompson, 496 F.3d 807, 811 (7th Cir. 2007) ("Thompson invited the agents into his home and agreed to be questioned."). Just two detectives participated in the questioning, which occurred at the Weaver's kitchen table. See United States v. Beckwith, 425 U.S. 341, 342-43, 347 (1976) (finding no custody where two agents questioned the defendant at his dining room table). Neither detective displayed a weapon, used any force, engaged in threatening conduct, or otherwise restrained defendant's movement during the questioning. See Thompson, 496 F.3d at 811 ("Additionally, the agents did not raise their voices or display their weapons in an intimidating manner, nor did they physically restrain Thompson in any way."). To the contrary, the recording shows that the encounter was entirely cordial. It is true that the detectives never told defendant he was free to leave or end the encounter, but given the other circumstances that fact alone cannot lead to a finding of custody. See United States v. Panak, 552 F.3d 462, 467-68 (6th Cir. 2009) (finding that this advice was not necessary where the encounter was cordial, brief, and occurred in the defendant's home).

In his objections, defendant points to various factors that he contends support a finding of custody at the time he made the damaging admissions.[1] I address each in turn.

---

[1] In his reply in support of the objections, defendant argues that the magistrate judge erred by considering the entirety of the encounter, rather than focusing on the circumstances

6

1.      Defendant notes that the detectives separated him and his wife while they continued the questioning.  The recording shows that Detective Hermann asked Mrs. Weaver to leave so they could talk to defendant in private, and she agreed; the detectives did not order her to go.  As the magistrate judge noted, this appears to have been a matter of professional courtesy, as Mrs. Weaver displayed visible shock after defendant admitted possessing the images.  See United States v. Hocking, 860 F.2d 769, 773 (7th Cir. 1988) ("Although the agents did ask Mrs. Hocking to leave the living room where the interview was conducted, they did so politely and with good reason."), partially overruled on other grounds, United States v. Levy, 955 F.2d 1098, 1103-1104 n.5 (7th Cir. 1992).

2.      Defendant indicates that the detectives "confronted" him with the picture of the boy and continued to question him after he denied knowledge of it.  However, the recording demonstrates that there was nothing confrontational about the encounter, and defendant cites no authority requiring the detectives to leave after the initial denial; his initial admission came just a few moments later.

3.      Defendant cites Hermann's testimony that defendant was no longer free to leave "once he started making those admissions." (Evid. Hr'g Tr. [R. 27] at 75:18-19.)  However, an officer's unarticulated plan has no bearing on the question of whether a suspect was in custody at a particular time.  Berkemer, 468 U.S. at 442.  In the present case, it is undisputed that Hermann did not tell defendant he was being detained until after Miranda warnings were given and the questioning had ended.  (Govt.'s Ex. 2 at 18.)

---

at the time Mrs. Weaver was asked to leave the room.  The court is supposed to consider the totality of the circumstances.  In any event, for the reasons that follow, even focusing on the events after Mrs. Weaver left the room, defendant was not in custody.

7

4.      Defendant notes that the detectives never told him he was free to leave or end the interaction, or that he could ask them to cease the questioning and leave his residence. As discussed above, this factor alone does not require a finding of custody. See Panak, 552 F.3d at 467 ("It would be strange, indeed, to say that a telltale sign of whether an individual must be Mirandized is whether the officer gave the individual one of the Miranda warnings – that she need not answer the questions.").

5.      Defendant notes that in the search warrant affidavit Hermann said that he "confronted" defendant with the image of suspected child pornography. (Govt.'s Ex. 9 at 5.) As indicated above, the recording shows that the detectives did not behave in a confrontational manner, regardless of the language Hermann used in the warrant application.

6.      Defendant contends that he was clearly the focus of the officers questioning him. Hermann testified that "up until a point he made that admission, I wasn't convinced that anything was going to happen as far as them being involved in this. It really was a shock when he came out and said they're going to be on there." (R. 27 at 68:17-20.) Hermann further stated that he did not consider defendant a "target" just because his name was associated with the IP address. (R. 27 at 83.) In any event, "Miranda warnings are not required merely because the individual questioned by law enforcement officers is a suspect or is the focus of a criminal investigation." United States v. Jones, 21 F.3d 165, 170 (7th Cir. 1994).

7.      Defendant notes that the detectives did not ask for consent to search the computers prior to confronting him with the image of suspected child pornography. However, he fails to explain how the order in which the detectives proceeded – asking for consent after defendant denied knowledge of the image – bears on the custody determination.

8.      Defendant argues that the continued interrogation after he made the first

8

purported admission conveyed that he was not free to leave. However, aside from the detectives asking Mrs. Weaver to leave, nothing about the encounter changed at that point: the detectives remained cordial, they did not raise their voices or draw their weapons, and they gave no indication by word or deed that defendant was not free to leave or end the questioning.

9. Defendant notes that the officers came to his home unannounced, on business of an unclear nature, at night. While it is true that the officers did not call ahead, they promptly explained to the Weavers why they were there; the record contains no evidence of trickery or subterfuge.[2] See Thompson, 496 F.3d at 811 ("There is also no evidence of coercion or subterfuge."). And while it is dark at 6:30 p.m. in February, this is not a case where the officers came very early or very late, when people would ordinarily be in bed or not otherwise expecting visitors.

10. Defendant notes that the detectives told him that a forensic analyst was waiting outside to search the computers. However, the detectives made clear that this would happen only if the Weavers consented, and the detectives applied no pressure to induce such consent.

---

[2]Defendant argues that the detectives misrepresented their true purpose in coming to the Weaver home, indicating that they wanted to clear up a "misunderstanding" or "glitch" in the numbers (Govt.'s Ex. 2 at 2), when they knew all along that defendant was the prime target. At the evidentiary hearing, Hermann credibly testified that he did not consider defendant a "target" just because his name was associated with the IP address. (R. 27 at 83.) In any event, as discussed in the text, the custody determination is based on objective circumstances, not the officers' subjective intent, and a non-custodial situation is not converted to one in which Miranda applies simply because the questioned person is one whom the police suspect. Oregon v. Mathiason, 429 U.S. 492, 495 (1977). In his reply, defendant also suggests that the detectives' ruse of being there to "clear things up" vitiated the Weaver's consent to the encounter. The record does not support defendant's contention that the detectives tricked him or his wife, nor does he provide any authority in support of this claim. Cf. United States v. Rutledge, 900 F.2d 1127, 1131 (7th Cir. 1990) ("Far from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead – all up to limits not exceeded here.").

9

11.     Defendant indicates that he promptly asked for a lawyer after being advised of his rights. Although he does not elaborate, defendant presumably contends that he would have asserted his rights sooner had be been advised of them. This is speculation, and it does not alter the nature of the encounter as described above.[3]

12.     Defendant notes that the detectives were already in the home at the time he was introduced to them. The record shows that Mrs. Weaver voluntarily invited the detectives in, and that defendant also agreed to speak to them inside. He did not refuse to cooperate or ask them to leave.

13.     Defendant asserts that the detectives engaged in repeated and relentless questioning despite repeated denials of involvement in any illicit activity. The record does not support this claim. Defendant denied recognizing the boy and that the image would be on the his computer, before making an almost spontaneous admission that the images were on his computer. The questioning was brief, about ½ hour total, with the pertinent part lasting just a few minutes.

Defendant acknowledges that under Stansbury an officer's subjective beliefs are irrelevant but argues that, unlike in Stansbury, in his case the detectives did convey that he was the prime suspect and that he was in custody after his wife was asked to leave the room so they could ask him more pointed questions. As discussed above, the mere fact that the detectives considered defendant a suspect means nothing absent evidence that they conveyed to him that he was not free to leave. As also discussed, the detectives asked Mrs. Weaver to leave as a matter of courtesy, not in order to convey that defendant was not free to leave.

---

[3]Defendant makes no claim that the detectives failed to stop the questioning after he invoked his right to counsel.

10

Finally, defendant quotes the questions the detectives asked him after Mrs. Weaver left the room. At no point during this exchange did the detectives suggest that defendant could not end the encounter. Indeed, they started by asking defendant, "Well you want to tell us about it a little bit?" (Govt.'s Ex. 2 at 14.) The detectives then asked a handful of questions about how many images defendant had, how he initially got into this, and what kind of age range. Detective Hermann indicated, "obviously this is a little concern for us." (Govt.'s Ex. 2 at 14.) But prior to the provision of Miranda warnings he said nothing suggesting that defendant was being detained or arrested.

For all of these reasons and those stated by the magistrate judge, I find that defendant was not in custody, nor had he been unlawfully seized,[4] at the time he made the damaging admissions. Accordingly, "there is no poisonous tree," United States v. Edwards, 885 F.2d 377, 387 (7th Cir. 1989), and the evidence seized pursuant to the search warrant need not be suppressed as fruit.[5]

---

[4] In his motion, defendant also argued that he had been unlawfully seized at the time of the admissions. Whether a person has been "seized" under the Fourth Amendment depends on many of the same factors used to determine whether he is in "custody" for purposes of the Fifth Amendment and Miranda. See, e.g., White v. City of Markham, 310 F.3d 989, 993-94 (7th Cir. 2002) (indicating that a person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave, with relevant factors including the threatening presence of several officers, the display of weapons, physical contact with the citizen, or the use of language or tone of voice indicating that compliance with the officer's request was required). For the reasons set forth in the text and the magistrate judge's recommendation, the detectives had not unlawfully seized defendant at the time of the questioning.

[5] Defendant makes no other challenge to the search warrant.

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 34) is adopted, and defendant's motion to suppress (R. 18) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 22nd day of September, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge